# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 2, 2016

Lyle W. Cayce
Clerk

No. 14-41384

RETRACTABLE TECHNOLOGIES, INCORPORATED; THOMAS J. SHAW,

> Plaintiffs - Appellees

v.

BECTON DICKINSON & COMPANY,

> Defendant - Appellant

Appeals from the United States District Court
for the Eastern District of Texas

Before JONES, WIENER, and HIGGINSON, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This appeal is the latest chapter in the long-running legal disputes between Becton Dickinson & Co. ("BD") and Retractable Technologies, Inc. ("RTI"), competitors in the market for syringes of various types and IV catheters. It arises from a $340 million jury verdict (after trebling) entered against BD for its alleged attempt to monopolize the United States safety syringe market in violation of § 2 of the Sherman Antitrust Act. The jury also found BD liable for false advertising under § 43(a) of the Lanham Act. Relying on principles of equity, the district court held that the treble damage award subsumed BD's liability to disgorge profits from the false advertising, but the court enjoined BD to stop using those ads and notify customers, employees, distributors, and others about the false claims.

No. 14-41384

We affirm in part, reverse in part, and vacate and remand in part. The § 2 claim for attempt to monopolize is infirm as a matter of law. First, patent infringement, which operates to increase competition, is not anticompetitive conduct. Second, false advertising is a slim, and here nonexistent, reed for a § 2 claim. Third, the allegation that BD "tainted" the market for retractable syringes while surreptitiously plotting to offer its own retractable a few years later is unsupported and incoherent. We affirm the Lanham Act judgment of liability for false advertising but must reverse and remand for a redetermination of disgorgement damages, if any. Finally, in light of the foregoing, we must vacate and remand the injunctive relief for reconsideration.

## BACKGROUND

BD and RTI are two major competitors, along with Covidien Ltd. ("Covidien") and Smiths Medical ("Smiths"), in the U.S. product market for safety syringes. Safety syringes are designed to prevent the transmission of blood-borne diseases like AIDS and hepatitis C to medical professionals or others who are accidentally pricked. The safety syringe market comprises four main products—shielding needles, pivoting needles, sliding sleeve needles, and retracting needles—each of which is best used in specific hospital, clinical, or office settings. BD produced all four types of safety syringes and was the major manufacturer of conventional syringes. RTI produced a conventional syringe and a safety IV catheter during some parts of the relevant period, but its principal product was the VanishPoint retractable syringe. The VanishPoint syringe has a fixed, albeit retracting needle, which provides admirable protection for injections but is not adaptable for a number of other hospital and clinical uses.

The parties' dispute began before the 2004–2010 period covered by this lawsuit. In 1989 RTI's founder, Thomas Shaw ("Shaw"), developed and patented retractable syringe technology, a groundbreaking innovation in

2

No. 14-41384

which the needle automatically retracts into the body of the syringe after an injection. Congress passed the Effective Needlestick and Safety Prevention Act effective in 2001 to encourage hospitals to use devices that would minimize needlesticks, and spurred the safety syringe industry. In 2002, approximately five years after RTI introduced the VanishPoint, BD created its own retractable syringe, the Integra. RTI contends that BD had to work around RTI's patents to design the Integra. Moreover, BD's Integra suffered from design flaws such as leaking and "premature plunger rod collapse," which prevented the syringe from delivering a full dose of medicine.

RTI outsold BD in the retractable syringe sub-market. BD sold no less than one-third of retractable syringes during the period in question, while RTI had a retractable syringe market share that increased to two-thirds. By 2010, in the relevant product market for all safety syringes, BD had a market share of 49%, Covidien a 30% share, Smiths a 10% share, and RTI a 6% share.

After it experienced initial difficulties persuading hospitals, clinics, and pharmaceutical operators like Walmart to purchase its VanishPoint, RTI sued BD in 2001 in the Eastern District of Texas for antitrust violations and product disparagement (the latter claim based on the same advertising issues litigated here). The parties settled the suit on July 2, 2004, BD paid RTI $100 million, and the parties executed a mutual release of claims "which accrued on or at any time prior" to the agreement's signing.

Barely three years later, RTI filed this suit alleging patent infringement and antitrust and Texas common law violations. The district court in the Eastern District of Texas bifurcated the litigation, tried the patent case first, and rendered judgment (including a mere $5 million in damages) for RTI on claims that BD's 1mL and 3mL versions of the Integra infringed the VanishPoint patents. On appeal, the Federal Circuit upheld the judgment only as to the 1mL Integra, which BD then removed from the market. *Retractable*

3

No. 14-41384

*Techs., Inc. v. Becton, Dickinson & Co.,* 653 F.3d 1296 (Fed. Cir. 2011); *see also* 659 F.3d 1369, 1370 (denying reh. en banc), *cert. denied,* 133 S. Ct. 833 (2013).

The district court reactivated RTI's non-patent claims in 2010. RTI amended its complaint and asserted that BD: monopolized and attempted to monopolize the markets for hypodermic syringes, safety needles and syringes, IV catheters, and safety IV catheters in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; excluded RTI from these markets in violation of the Clayton Act § 3, 15 U.S.C. § 14 (later amended to include a Sherman Act § 1 exclusive dealing claim); violated similar provisions of Texas antitrust law; engaged in false advertising contrary to the Lanham Act § 43(a), 15 U.S.C. § 1125(a)(1)(B); and committed Texas common law torts of product disparagement, interference with prospective contract or business relations, and unfair competition.

RTI's evidence during the multi-day trial in September 2013 emphasized BD's contract practices that allegedly foreclosed competition by offering customers sole source contracts, loyalty discounts, and market share rebates. RTI additionally complained of BD's false advertising (in three separate promotional claims), patent infringement, and unfair competition.

At the close of evidence, RTI dropped its claim for Lanham Act damages and dismissed the state law claims. The court submitted twelve separate antitrust interrogatories covering four liability theories—monopolization, attempted monopolization, contractual restraint of trade, and exclusive dealing—each pertinent to three products—safety syringes, conventional syringes, and safety IV catheters. Antitrust damages were submitted on two bases—"anticompetitive contracting damages" (for each of the three products) and "deception damages" regarding only safety syringes. Finally, the Lanham Act false advertising claim was submitted for representations that BD produced the "world's sharpest needle" and its syringes have "low waste space."

No. 14-41384

The jury returned a verdict rejecting all but one of the twelve antitrust claims; it held BD liable for attempted monopolization in the market for safety syringes. While rejecting all damages for "anticompetitive contracting," the jury found that RTI suffered "deception damages" exceeding $113,500,000, and it found liability on all the misrepresentations.

The district court wrote a brief opinion rejecting BD's motion for judgment as a matter of law. It trebled the Sherman Act damages, added statutory attorneys' fees, declined on equitable grounds to award disgorgement of profits for BD's false advertising, and enjoined BD as previously noted. BD appealed.

## DISCUSSION

Among the many grounds BD has raised, we need consider only four: whether judgment as a matter of law was required on the Sherman Act § 2 or Lanham Act § 43(a) claims, whether the district court abused its discretion in ordering BD to disgorge profits for false advertising, and the propriety of injunctive relief. We discuss each in turn.[1]

## I.    Section 2 Attempted Monopolization Claim

BD unsuccessfully sought judgment as a matter of a law on the § 2 attempted monopolization claim. We review the denial of a JMOL de novo, considering the facts in the light most favorable to the verdict. *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015). "We can reverse a denial of a motion for judgment as a matter of law only if the jury's factual findings are not supported by substantial evidence or if the legal conclusions implied from the jury's verdict cannot in law be

---

[1] In light of our conclusion that the antitrust verdict must be reversed, we do not consider BD's other objections to the antitrust verdict, including: the district court's refusal to give the jury BD's requested "*Stearns* instruction," the district court's admission of the patent verdict, the district court's refusal of BD's request for a special verdict form, or BD's various objections to the RTI damage model.

No. 14-41384

supported by those findings." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015) (citation omitted). In this case, the antitrust verdict cannot be legally supported by the jury's findings.

Section 2 of the Sherman Antitrust Act not only prohibits the abuse of monopoly power but also any "attempt to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. To prevail on an attempted monopolization claim, a plaintiff must show: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S. Ct. 884, 890–91 (1993). BD does not challenge the specific intent element. For purposes of this analysis, we also assume the hotly disputed contention that RTI has satisfied the dangerous probability element, which assessed BD's market power in the relevant United States market for safety syringes. Therefore, we consider only whether RTI has demonstrated that BD engaged in anticompetitive conduct that violates the Sherman Act.

Critical to our analysis is that the jury verdict significantly narrowed the factual predicate for potential antitrust liability by rejecting RTI's case for exclusionary contracting practices by BD. A large portion of RTI's trial presentation consisted of its witnesses' claims that BD hindered competition by engaging in exclusionary contracting with customers for safety syringes using sole source contracts, loyalty discounts, and market share rebates. BD, however, successfully rebutted the attempt, largely by offering the testimony of over a dozen purchasers of safety syringes that BD's practices did not foreclose their ability to choose among competing products. As a result, RTI's verdict for anticompetitive conduct must rest upon three types of "deception" by its rival: patent infringement by BD's 1mL Integra syringe (but not the 3 mL syringe); two false advertising claims made persistently; and BD's

6

No. 14-41384

alleged "tainting the market" for retractable syringes in which it alone competed with RTI. Each of these theories must be separately analyzed in light of settled principles of antitrust law.

Predatory or anticompetitive conduct, which excludes competitors from a market, is "conduct, other than competition on the merits or restraints reasonably necessary to competition on the merits, that reasonably appear[s] capable of making a significant contribution to creating or maintaining monopoly power." *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000) (citations, brackets, and quotations omitted). Further, "'exclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32, 105 S. Ct. 2847, 2859 (1985) (quoting 3 PHILLIP E. AREEDA & DONALD TURNER, ANTITRUST LAW 78 (1978)). To determine whether conduct is exclusionary, the court looks to the "proffered business justification for the act." *Taylor,* 216 F.3d at 475. "If the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999). *Aspen Skiing* provides an example of conduct taken without a rational business purpose other than to exclude rivals. There, the dominant ski company "fail[ed] to offer any efficiency justification whatever" for its decisions, 472 U.S. at 608, 105 S. Ct. at 2860, and "was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 610-11, 105 S. Ct. at 2861.

*Taylor,* however, added the important explanation that "[not] all 'unfair' conduct—even by a monopolist and a fortiori by one who is not—fits within the prohibition of § 2." 216 F.3d at 475-76, (quoting 3A PHILLIP E. AREEDA &

No. 14-41384

HERBERT HOVENKAMP, ANTITRUST LAW ¶ 806d, at 331 (1996)).    Indeed, "[a]ntitrust law is rife with similar examples of what competitors find to be disreputable business practices that do not qualify as predatory behavior." *Id.* at 476.    *Taylor* accordingly rejected a § 2 claim based almost exclusively on disreputable but not predatory conduct.    *See also City of Groton v. Conn. Light & Power,* 662 F.2d 921, 928 (2d Cir. 1981) (holding alleged instances of misconduct, none of which is anticompetitive, cannot be cumulatively anticompetitive).    RTI contends that unfair competitive practices can be aggregated into legally predatory conduct, citing in support *Associated Radio Services Co. v. Page Airways, Inc.,* 624 F.2d 1342 (5th Cir. 1980).    In *Page Airways,* a competitor was held liable under § 2 after it stole the plaintiff company's employees, bribed employees, arranged for the theft of documents, and filed sham lawsuits, all to put the plaintiff out of business and facilitate its own competition without bearing startup costs.    This court upheld the judgment while voicing extreme reluctance to allow a treble damage verdict to rest upon business torts alone.    624 F.2d at 1350.    Significantly, this court cautioned that *Page Airways* "should not be read to encourage all who suffer injury to business or property through an alleged business tort to bring suit under section 1 or 2 of the Sherman Act."    624 F.2d at 1358.    There has been no Fifth Circuit case since *Page Airways* in which a congeries of business torts was found so egregious as to constitute actionable predatory or exclusionary conduct.    *See Taylor,* 216 F.3d at 484 (explaining that alleged misdeeds of competitor reflected no more than individual competitive decisions rather than anticompetitive conduct).

This distinction between unfair conduct and anticompetitive conduct is critical to maintain because the antitrust laws "do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'" *Brooke Grp. Ltd. v. Brown*

8

*& Williamson Tobacco Corp.*, 509 U.S. 209, 225, 113 S. Ct. 2578, 2589 (1993) (internal quotation omitted). Instead, the antitrust laws were designed to protect "*competition*, not *competitors*." *Id.* (citation omitted) (emphasis original). *Brooke Grp.*, of course, postdates *Page Airways*. The Supreme Court put this distinction even more emphatically, for present purposes, in stating that "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'" *Id.* at 225, 113 S. Ct. at 2589 (quoting *Hunt v. Crumboch,* 325 U.S. 821, 826 (1945)).

## A. Patent Infringement

This court long ago held that a defendant's patent infringement cannot serve as a basis for imposing antitrust liability because the patent laws and antitrust laws serve two different and incongruent purposes that "to an extent . . . conflict." *Kinnear-Weed Corp. v. Humble Oil & Ref. Co.*, 214 F.2d 891, 894 (5th Cir. 1954). Patent laws are designed to secure for patent holders a time-limited exclusive right to exploit their discoveries, but this is "not the kind of public purpose protected by the antitrust laws," which seek to "protect the free flow of interstate commerce." *Id.* That a patentee may anticompetitively extend its market power to products other than those covered by a patent, and thus violate the antitrust laws, is well settled. *See United States v. Line Material Co.*, 333 U.S. 287, 308, 68 S. Ct. 550, 561 (1948). RTI, however, cites no case holding the converse: that antitrust liability may be founded in whole or in part upon patent infringement. By definition, patent infringement invades the patentee's monopoly rights, causes competing products to enter the market, and thereby increases competition. RTI, in fact, persuaded another jury of exactly this procompetitive result when it proved patent infringement

by BD's 1mL Integra safety syringe. The judgment against BD, which was then forced to remove the competing product from the market, diminished competition but enforced RTI's patent rights. We reaffirm what has been evident and unchallenged since *Kinnear-Weed*: "patent infringement is not an injury cognizable under the Sherman Act." *Northwest Power Prods., Inc. v. Omark Indus., Inc.,* 576 F.2d 83, 88-89 (5th Cir. 1976) (citing *Kinnear-Weed*, 214 F.2d at 894*)*. The jury's verdict cannot be legally supported by BD's infringement on RTI patents.

## B. False Advertising

The jury found, and BD does not appeal the finding, that BD falsely advertised throughout the period under litigation that BD needles are the "world's sharpest" (a proxy for patient comfort) and have "low waste space" (allowing more medicine to be dispensed from the syringe), and BD's data prove the claims.[2] On the first claim, BD conducted periodic tests of needle sharpness from the early 1990s, but by about 2003, the tests began to indicate that competitors' needles were equaling or surpassing BD needles to some extent. BD's "world's sharpest" advertising continued unabated. Likewise, BD advertised that its Integra needles, which competed only with RTI's VanishPoint, have as much as seven times "lower waste space." Although the claim was true when initially made, BD's tests in 2003, 2005, and 2008 revealed that the waste space measurement was no longer accurate. BD removed the inaccurate measurement from some advertising and marketing materials but its own website and other materials still displayed erroneous waste space comparisons. BD applied the false claim to customer-specific comparative spreadsheets, and imbedded it in a "cost calculator" that sales

---

[2] RTI also alleged that BD falsely promoted its safety syringes as "safe," but the court found insufficient evidence to support sending this claim to the jury, and RTI has not appealed.

No. 14-41384

representatives could use to demonstrate how much money customers would allegedly save with Integra syringes. The cost calculator appeared on BD's website. Some distributors and resellers of the defendant's products continue to use BD's false claims in their promotional materials.

This court's decision in *Stearns Airport Equipment Co. v. FMC Corp.* sets an extremely high bar for a claim that false advertising, without more, can support an antitrust claim. In *Stearns*, this court held that the aggressive sales pitches by an airline boarding bridge manufacturer to municipal airport buyers was not actionable anticompetitive conduct as a matter of law. Summarizing the defendant's several challenged tactics as attempts "to persuade buyers to favor their product," we reasoned that the sales pitches "may have been wrong, misleading, or debatable," but they were all "arguments on the merits, indicative of competition on the merits." 170 F.3d at 523–25; *cf. Page Airways*, 624 F.2d at 1354 (distinguishing "bribes and similar practices" from "mere misrepresentations of one's own or a rival's product").

RTI contends that unlike *Stearns*, this case involves "sustained lying about objectively measurable facts," but *Stearns* did not draw distinctions among touts when concluding that "wrong, misleading, or debatable" arguments relating to the merits of a product do not raise antitrust concerns. *Id.* BD's false comparative advertising, sanctionable though it may be as a business tort, was plainly "on the merits." The *Stearns* court went on to say that:

> To the extent [such representations] were successful, they were successful because the consumer was convinced by either FMC's product or FMC's salesmanship. . . . Without a showing of some other factor, we can assume that a consumer will make his decision only on the merits. To the extent a competitor loses out in such a debate, the natural remedy would seem to be an increase in the losing party's sales efforts on future potential bids, not an antitrust suit.

11

No. 14-41384

*Id.* at 524–25. *Stearns* has not been limited as RTI would have it. *See, e.g., Santana Prods, Inc. v. Bobrick Washroom, Inc.*, 401 F.3d 123,133 (3d Cir. 2005) (quoting above passage).

The Seventh Circuit does not recognize Sherman Act claims based on false advertising. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 851 (7th Cir. 2011) ("As a general matter, such statements are outside the reach of the antitrust laws, however critical they may be of a competitor's product or business model [unless false statements were accompanied by a "coercive enforcement mechanism"]. . . . This analysis holds true even if the Hospital's statements about Mercatus were false."); *see also Sanderson v. Culligan Int'l. Co.*, 415 F.3d 620, 624 (7th Cir. 2005) ("Commercial speech is not actionable under the antitrust laws. . . . There can be no restraint of trade without a restraint.") (internal quotation marks omitted). The Seventh Circuit's basic reasoning adheres to traditional free speech principles: "If [a competitor's statements about another] should be false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech---the marketplace of ideas." *Schachar v. Am. Acad. of Opthalmology, Inc.,* 870 F.2d 397, 400 (7th Cir. 1989).

The broader point underlying *Stearns* is the distinction embodied in our precedents between business torts, which harm competitors, and truly anticompetitive activities, which harm the market. As we have explained, "[t]he thrust of antitrust law is to prevent restraints on competition. Unfair competition is still competition and the purpose of the law of unfair competition is to impose restraints on that competition." *Nw. Power Prods.*, 576 F.2d at 88. Thus, absent a demonstration that a competitor's false advertisements had the potential to eliminate, or did in fact eliminate, competition, an antitrust

12

lawsuit will not lie.[3]  *See id.*; *cf. Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 100 (5th Cir. 1988) ("Advertising that creates barriers to entry in a market constitutes predatory behavior of the type the antitrust laws are designed to prevent."). RTI may have lost some sales or market share because of BD's false advertising, but it remains a vigorous competitor, and it did not contend that BD's advertising erected barriers to entry in the safety syringe market.

That false advertising alone hardly ever operates in practice to threaten competition is confirmed not only by a dearth of Fifth Circuit precedent but by two additional considerations.  First, false advertising simply "set[s] the stage for competition in a different venue:  the advertising market." *Sanderson v. Culligan Int'l Co*, 415 F.3d 620, 623 (7th Cir. 2005).  In such a setting, a business that is maligned by a competitor's false advertising may counter with its own advertising to expose the dishonest competitor and turn the tables competitively against the malefactor. *See Mercatus Grp.*, 641 F.3d at 852.  Far from restricting competition, then, false or misleading advertising generally sets competition into motion.  Second, it will often be difficult to determine whether such false statements induced reliance by consumers and produced anticompetitive effects, or whether the buyer attached little weight to the statements and instead regarded them as biased and self-serving. *See id*.  The

---

[3] Our decision in *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983) is not to the contrary.  The conduct in *Multiflex* involved a conspiracy by Samuel Moore with three industry manufacturer-distributors to prevent Multiflex from accessing the channels of distribution.  *Id.* at 988.  This conduct would have excluded Multiflex—Samuel Moore's only other competitor—from the market by preventing Multiflex from reaching the end-users of its product because the end-users made their purchases of hydraulic hoses exclusively through the three manufacturer-distributors.  *Id.* at 984, 988.  The false and disparaging statements made by Samuel Moore to Multiflex's bankers and customers about the firm's solvency and product quality, *id.* at 991–92, 994 n.14, were anticompetitive because these statements were part and parcel of the conspiracy that threatened to cut off Multiflex—its only other competitor—from the channels of distribution.  In this case, BD's false advertising had no comparable potential to eliminate competition.

No. 14-41384

latter impact becomes more likely where, as here, the relevant consumers are sophisticated.  In this case, for instance, RTI produced market surveys that BD's false advertising touched interests relevant to purchasers of safety syringes, but not a single buyer's representative came forward to testify to a purchase motivated by the "world's sharpest needle" and "lower waste space" claims.

Other circuits have also treated skeptically antitrust claims predicated on false advertising and therefore adopted a rebuttable presumption that false advertising has only a *de minimis* effect on competition. *See Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 370 (6th Cir. 2003); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997); *Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).  Inspired by a prominent treatise, these circuits adopted the *de minimis* presumption along with variations on a six-part test that a plaintiff must satisfy to support an antitrust claim premised on false advertising:  the statements at issue must be (1) clearly false; (2) clearly material; (3) clearly likely to induce unreasonable reliance; (4) made to unsophisticated parties; (5) continued for long periods; and (6) not readily cured by rivals.  *Am. Prof'l Testing Serv.,* 108 F.3d at 1152 (citing 3 PHILLIP E. AREEDA & DONALD TURNER, ANTITRUST LAW ¶738a, at 278-79 (1978)).  Each circuit seems to have tweaked the Areeda six-factor test somewhat, but the basic intent of each court is to create a sharp distinction between ordinary false advertising torts and a defendant's course of conduct that could actually exclude competition.

Three other circuits have viewed such claims critically without announcing a particular test.  *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 n.14 (3d Cir. 2010); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 674–75 (D.C. Cir. 2005); *Spanish Broad. Sys. of Fla., Inc.*

No. 14-41384

*v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1076 (11th Cir. 2004). *But cf. Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1127–28 (10th Cir. 2014) (applying, without adopting, the six-factor rebuttable presumption and holding that Lenox created a question of material fact regarding three of the factors).

Even if we were to apply the *de minimis* presumption here, RTI could not uphold a § 2 verdict for BD's false advertising under the six-part test. BD's false claims were not made to unsophisticated parties (part 4), but to hospitals and GPOs that used multidisciplinary committees who had experience with the competing products.[4] The advertising claims were not shown to be "clearly likely to induce unreasonable reliance" (part 3) on the part of customers.[5] Finally, there was no showing that the "world's sharpest needle" and "lower waste space" claims could not be readily disproved, as they were at this trial, by rivals (part 6).

Moreover, no facts adduced at trial indicated that BD's advertising in fact harmed competition. RTI not only competed in but has dominated the retractable syringe sub-market, selling up to 67% of all retractable syringes. Indeed, competition within the overall safety syringe market—particularly between BD, Covidien, and Smiths—has remained robust. When asked if he could substantiate a causal connection between false advertising and BD's

---

[4] At oral argument RTI argued that the hospitals were averse to trying new products. It appears, however, that most of the evidence at trial relating to this point focused on BD's alleged "anticompetitive contracting" practices—an argument that the jury rejected.

[5] Trial testimony by Dr. Carl Vartian explained that hospitals employ multidisciplinary committees made up of hospital administrators, specialists, and general physicians to evaluate the safety of products like syringes. Hospital purchasing decisions also involve extensive review of medical literature, consultation with other hospitals that already use the product, and trial periods for new products within a ward or subdivisions of the hospital. Both Dr. Vartian and Nurse Jeanette Akin testified that when it comes to advertising for products like syringes, "we usually don't even look at it" and "we don't give that much credibility" when making purchasing decisions.

No. 14-41384

sales numbers, the Plaintiff's economic expert, Dr. Maness, said he could not. RTI produced no evidence of customers being misled or confused and purchasing BD's syringes instead of RTI's because of the advertisements. Record evidence even indicates that some customers, such as Walgreens, increased their purchases of RTI syringes after being shown BD's erroneous "waste space" comparisons. RTI's evidence consisted mostly of boastful e-mail exchanges between BD sales representatives recounting what they believed were successful sales pitches, but notably there was no testimony from the customers themselves. And as the district court noted, "BD presented evidence that many sales were made for reasons other than the false advertisements."

RTI did not satisfy *Stearns* or any relevant test that circuit courts have devised to render false advertising claims cognizable under the antitrust laws.

## C. Tainting the Market

The remaining component of RTI's antitrust verdict is its four-part theory that BD (1) continued to market its flawed Integra retractable needles during the years covered by this litigation, and (2) declined to make needed engineering fixes, (3) for the purpose of persuading purchasers that *all* retractable syringes, including those of RTI, are inherently unreliable, so that (4) BD would lie in wait for RTI's patents to expire in 2015, avail itself of RTI's (then-unprotected) superior technology, create and unveil a new and superior retractable syringe, and take over the market by 2019.

The first two parts of the theory, although challenged by BD, have some support in the record. The third part has no direct evidentiary basis, is illogical, and is incoherent when considered with the fourth part. And the fourth part, even if true, cannot constitute anticompetitive conduct because it is precisely the type of activity to be expected from competitors when valuable patent rights expire; the patentee's monopoly is eliminated, and the free market reigns where anybody can exploit the formerly protected technology.

No. 14-41384

Part (3), the tainting theory, must be addressed further because of the record support for the two underlying facts concerning the Integra's design flaws and BD's reluctance to redesign the product to cure them completely. These facts alone do not, however, imply that BD deliberately continued to sell "flawed" Integra needles to sophisticated consumers for a number of years in order to discourage the market from buying VanishPoint safety syringes. There is no direct evidence of BD's intent to "taint" or stunt the retractable syringe market. BD made money selling Integra syringes, albeit less than it made from sales of non-safety syringes. Consumers evidently found them satisfactory, whether flawed or not, because BD's share of the retractable market was no less than about 33% during the period in question. RTI's market share simultaneously increased to two-thirds, and its sales nearly doubled. If BD was attempting to stunt the market for retractables in order to limit RTI's competition, it did a mighty poor job.

The tainting theory is entirely illogical as a vehicle to prove exclusionary conduct. If BD set out to exclude RTI from the market by tainting its own product, who would be the loser? Would Kellogg's sell a "nutritional" cereal that tastes like sawdust in order to discourage consumers from sampling Quaker Oats's competing product? It is the producer of defective products, after all, who gets sued, suffers product recalls, and damages its reputation in the eyes of the public—not its competitors, who are happy to take up the slack. RTI might assert that this irrationality is exactly what *Stearns* had in mind by condemning exclusionary practices that have "no rational business purpose other than to exclude competitors." *Stearns,* 170 F.3d at 522.[6] But as has been noted, BD's rational business purpose was to continue selling, and making a

---

[6] This conduct is a far cry from corporate bribery and filing sham lawsuits, *see Page Airways,* 624 F.2d at 1356, or from deliberately reducing one's own sales to harm the competitor's business, *see Aspen Skiing,* 472 U.S. at 610-11.

profit on, a product that had a receptive market. In fact, RTI's market survey expert not only found no evidence of tainting but found that consumers of retractable syringes who were familiar with the VanishPoint had a very favorable impression of it.

Finally, the fourth part of this theory, BD's longer-term plan to compete with a new retractable syringe after RTI's patents expire, utterly belies the taint theory. Tainting the current market for retractable syringes would be both unnecessary and counterproductive to the company's longer-term goal. It is obviously an unnecessary means to prepare the market to accept the newly designed product, particularly when the customary method, a new advertising campaign, would suffice to fuel demand. It is counterproductive because if safety syringe purchasers were deterred from using both Integra and VanishPoint products due to the Integra's design flaws, RTI cannot explain why BD might think they would flock to purchase the "new and improved" retractable after its introduction.[7]

For all these reasons, RTI has not demonstrated that BD engaged in predatory or anticompetitive conduct as a matter of law. The verdict for § 2 liability rests on "legal conclusions [that] . . . cannot in law be supported by those findings." *MM Steel*, 806 F.3d at 843.

## II.   Section 43(a) Lanham Act Claim

BD also moved for judgment as a matter of law on RTI's Lanham Act claim based on the affirmative defenses of res judicata and laches. The district

---

[7] The only "evidence" for this plan is one internal BD planning document, dated 2011, that evaluated the market for retractable syringes and offered various alternative suggestions for producing a new, low-cost retractable syringe that would avoid "dissatisfiers" in products then on the market. Even if the plan had been adopted, its cornerstone, as hypothesized by RTI's selective reading, was to take advantage of RTI's technology after the company's patents expire. As has been noted, this course of action would be both legal and procompetitive.

No. 14-41384

court denied this motion. We review de novo the res judicata ruling, *Am Quarter Horse Ass'n*, 776 F.3d at 327, but the application of laches is reviewed on appeal for an abuse of discretion. *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 334 (5th Cir. 2008). Under the abuse of discretion standard, "[t]he district court's findings of delay, inexcusability, and prejudice are findings of fact that can be overturned only if they are clearly erroneous," or "if in view of the entire record [the finding] is 'illogical or implausible.'" *Geyen v. Marsh*, 775 F.2d 1303, 1310 (5th Cir. 1985) (citation omitted).

## A.    Res Judicata

"Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 414 (1980). A claim in a subsequent suit will be barred under res judicata principles if: (1) the prior suit involved identical parties; (2) the prior judgment was rendered by a court of competent jurisdiction; (3) the prior judgment was a final judgment on the merits; and (4) the same claim or cause of action was involved in both cases. *In re Ark-La-Tex Timber Co., Inc.*, 482 F.3d 319, 330 (5th Cir. 2007). At issue here is only the fourth element: whether the settlement of RTI's first lawsuit against BD involved the same claims or causes of action as the current lawsuit. This court applies a "transactional test" to make this determination, focusing on whether the cases "are based on the same nucleus of operative facts." *United States v. Davenport*, 484 F.3d 321, 326 (5th Cir. 2007) (citations omitted). The court should consider "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 396 (5th Cir. 2004).

No. 14-41384

BD argues that this issue is resolved by *Oreck Direct, LLC v. Dyson, Inc.*, 560 F.3d 398 (5th Cir. 2009). We disagree. In *Oreck*, this court dismissed Oreck's false advertising claim under the Lanham Act concerning two Dyson advertisements asserting that its DC18 vacuum suffered "no loss of suction" and that it was the "most powerful lightweight" vacuum. *Id.* at 400. Because Oreck had settled a previous Lanham Act lawsuit against Dyson concerning advertisements that its vacuums (not limited to a specific model) do not lose suction, we held the later suit barred by res judicata. *Id.* at 403-04. Crucial to this claim preclusion holding, however, was the fact that Dyson utilized the model-specific advertisements at issue while Oreck's first lawsuit was pending, and information about this vacuum model was produced during discovery. *Id.* The district court confirmed that the "case d[id] not present a situation in which plaintiff's claims are based on conduct transpiring only after the earlier litigation had concluded." *Oreck Direct, LLC v. Dyson, Inc.*¸ 544 F. Supp. 2d 502, 511 (E.D. La. 2008). Since Oreck "could have" included the model-specific advertisements in its first lawsuit, we held that the second lawsuit was claim precluded. *Oreck*, 560 F.3d at 403–04 & nn.6–7.

*Oreck* does not control this case. The advertisements RTI complains of in its second lawsuit were made after the 2004 settlement of the first lawsuit. There is no indication that RTI was on notice before the 2004 settlement that BD would continue to utilize the "sharpest needle" and "waste space" comparative advertisements in sales pitches and marketing materials. RTI therefore could not have brought these claims during the pendency of the first lawsuit, and the new post-2004 advertisements and sales tactics of BD created new causes of action that are not barred by res judicata. *See Lawlor v. Nat'l Screen Service Corp.*, 349 U.S. 322, 327, 75 S. Ct. 865, 868 (1955) (holding that antitrust violations that continued after the settlement of the first lawsuit were new causes of action not barred by res judicata even though "both suits

20

No. 14-41384

involved 'essentially the same course of wrongful conduct'"); *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 314 (5th Cir. 2004) ("We have held that 'subsequent wrongs' by a defendant constitute new causes of action . . . . [T]he 'subsequent wrongs' we previously considered occurred either after the plaintiffs had filed their prior lawsuit or after the district court had entered judgment in the prior lawsuit"); 18 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 4409, at 227 (3d ed. 2008) ("A substantially single course of activity may continue through the life of a first suit and beyond. The basic claim-preclusion result is clear: a new claim or cause of action is created as the conduct continues.").

## B.    Laches

Laches is an affirmative defense barring suit when a plaintiff's inexcusable delay in bringing a cause of action has prejudiced the defendant. *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998). To prevail, the defendant must demonstrate: "(1) a delay asserting a right or claim; (2) that the delay was inexcusable; [and] (3) that undue prejudice resulted from the delay." *Id.* (internal citation omitted). "The period for laches begins is when the plaintiff knew or should have known" of the defendant's injurious conduct. *Id.* Although laches is an equitable defense, it is usually applied "with reference to the limitations period for the analogous action at law," *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002), which may be state law if no federal limitations law exists. *Lopez ex rel. Gutierrez v. Premium Auto Acceptance Corp.*, 389 F.3d 504, 506–507 (5th Cir. 2004). Laches applies under the Lanham Act for these reasons, and Texas law is the relevant comparator here.

BD urges this court to apply Texas's two-year statute of limitations for unfair competition and to join the circuits that employ a strong presumption that any lawsuit filed outside of the statute of limitations is barred by laches.

No. 14-41384

*See Jaso v. The Coca-Cola Co.*, 435 F. App'x 346, 356 n.10 (5th Cir. 2011) (collecting cases). RTI, however, advocates the application of Texas's four-year limitations period for fraud claims. RTI filed this lawsuit in 2007, three years after the settlement of the first lawsuit in 2004; thus, the choice of comparator statute of limitations is potentially decisive. BD also contends that the district court's conclusion that it was not prejudiced by any inexcusable delay on RTI's part was clear error because the delay "increased BD's exposure for no reason other than increasing RTI's recovery."

We need not decide in this case the issues of the applicable statute of limitations, the strong presumption, or whether BD proved an inexcusable delay by RTI, because in any event, the district court neither erred nor abused its discretion in concluding that BD suffered no undue prejudice. BD obviously knew from the parties' just-concluded litigation that RTI objected to the needle sharpness and waste space claims, and BD had every reason to know that its ongoing advertisements of the same claims, which continued through 2011, were inaccurate. The district court's factual findings are not clearly erroneous; as a result, the district court did not abuse its discretion in rejecting the affirmative defense of laches. *See Geyen*, 775 F.2d at 1310.

## III. Disgorgement Order

BD challenges the district court's conclusion that it is required to remedy the Lanham Act violations by disgorging a portion of its profits from sales of Integra syringes. This determination is reviewed for an abuse of discretion. *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 369 (5th Cir. 2000).

Subject to principles of equity, a defendant's Lanham Act violations may entitle the plaintiff to a portion of the defendant's profits attributable to the false advertising. 15 U.S.C. § 1117(a). Any award of profits is "not automatic . . . and is committed to the discretion of the district court." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998). A court considers

No. 14-41384

six non-exclusive factors in determining whether an award of profits is appropriate: "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 349 (5th Cir. 2002) (citing *Pebble Beach*, 155 F.3d at 554).

Even if disgorgement is appropriate, however, a plaintiff "is only entitled to those profits attributable" to the false advertising. *Pebble Beach*, 155 F.3d at 554. Accordingly, if a plaintiff fails to present evidence that the defendant benefitted from the false advertising, the plaintiff may not recover any of the defendant's profits. *Logan v. Burgers Ozark Cty. Cured Hams, Inc.*, 263 F.3d 447, 465 (5th Cir. 2001); *see also Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 966 F.2d 956, 957 (5th Cir. 1992) ("The reason why Hard Rock Cafe's profits were not awarded was . . . the lack of evidence showing that any of Defendant's profits were the result of its infringement of the mark." (emphasis omitted)).

BD first argues that RTI failed to identify what portion of BD's profits (if any) were attributable to false advertising. Additionally, BD contends that the district court abused its discretion in weighing three of the *Pebble Beach* factors, inasmuch as the court (1) did not specify any amount of diverted sales; (2) failed to find that BD willfully engaged in false advertising; and (3) erred in holding that RTI did not unreasonably delay in filing suit.

We find no clear error in the district court's conclusion that at least some portion of BD's profits were attributable to the false advertising. Indeed, BD acknowledged in the district court, its expert witness's opinion that $7.2 million in profits—netting to $560,000 after deductions for costs and expenses—could be attributable to the waste space advertisements. In *Logan*

23

or *Texas Pig Stands,* by contrast, there was no evidence of attribution. Similarly unassailable is the finding that BD had the intent to confuse or deceive by continuing to use advertisements it knew were false. That BD may not have willfully engaged in false advertising does not change this analysis because a finding of willfulness is not a prerequisite to remedial disgorgement. *Quick Techs.*, 313 F.3d at 349. Finally, we have approved the district court's finding that RTI did not unreasonably delay.

Nevertheless, the district court's equitably-founded decision not to impose disgorgement rested in large part on the premise that RTI was adequately compensated by a $340 million antitrust award. Having overturned the antitrust judgment, we must remand to the district court for a thorough re-weighing of the remaining factors and the entirety of the record to determine whether and how much profit BD should disgorge to compensate for the Lanham Act violations. In particular, when assessing the "diversion" factor, the district court should bear in mind that speculative and attenuated evidence of diversion of sales will not suffice. *Seatrax*, 200 F.3d at 372 & n.8. Further, if disgorgement of profits is appropriate, the court must recall that "[u]nder 15 U.S.C. § 1117(a), the plaintiff has the burden of showing the amount of the defendant's sales of the infringing product. The defendant has the burden of showing all elements of cost and other deductions." *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 586 (5th Cir. 1980).

## IV.    Injunctive Relief

BD's final objection is to the district court's injunction requiring BD to "notify customers, distributors, and other market participants" that it "wrongfully made false and misleading advertising claims" in its "needle

No. 14-41384

sharpness" and "waste space" advertisements.[8] We review the grant or denial of injunctive relief for an abuse of discretion. *Aransas Project v. Shaw*, 775 F.3d 641, 663 (5th Cir. 2014). "The district court abuses its discretion if it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief." *Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 62 F.3d 690, 693 (5th Cir. 1995).

"A plaintiff seeking injunctive relief must show a real and immediate threat of future or continuing injury apart from any past injury." *Aransas Project*, 775 F.3d at 663. As with all injunctive relief, an equitable remedy for false advertising under the Lanham Act should be "no broader than reasonably necessary to prevent the deception." *Better Bus. Bureau of Metro. Hous., Inc. v. Med. Dirs., Inc.*, 681 F.2d 397, 405 (5th Cir. 1982). Nonetheless, "[a] district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct." *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1329 (5th Cir. 1987) (citation omitted).

RTI sought an injunction under both the Clayton Act (in order to prevent future antitrust violations) and the Lanham Act (to prevent future false advertising). The district court's order, however, suggests that injunctive relief was granted to remedy the purported antitrust violations. To that extent, our reversal of the antitrust verdict means that the injunction rests on an "erroneous conclusions of law" and is an abuse of discretion. *Peaches Entm't*, 62 F.3d at 693. It remains theoretically possible, while bearing in mind that

---

[8] To the extent the court prohibited BD's use of the "needle sharpness" and "waste space" advertisements and required the implementation of a training program to instruct employees and distributors not to use the old marketing materials, BD does not challenge that injunctive relief.

No. 14-41384

equitable relief is normally appropriate only in the absence of an adequate remedy at law (i.e., money damages), that a viable injunction might still be an appropriate remedy for the Lanham Act violations. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 675 (5th Cir. 2000). With these caveats, we vacate and remand the injunction.

## CONCLUSION

For the foregoing reasons we **REVERSE** the denial of BD's motion for Judgment as a Matter of Law concerning the attempted monopolization claim and **RENDER** judgment on that claim in favor of BD. We also **AFFIRM** the judgment for Lanham Act liability but **REMAND** to the district court to consider whether and how much profit should be disgorged. Finally, we **VACATE** and **REMAND the injunctive relief ordered.**

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.**